# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| PRITPAL SINGH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No.  04 C 2088 |
| v. | ) |
| | ) |
| BP PRODUCTS NORTH AMERICA, INC. | ) HONORABLE DAVID H. COAR |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Before this Court is Defendant BP North America, Inc.'s motion for summary judgment on Plaintiff's claims for violation of the Petroleum Marketing Practices Act, breach of contract, and equitable recoupment.

## I.      BACKGROUND FACTS

The undisputed facts, taken from the parties' Local Rule 56.1 submissions, are as follows. Plaintiff Pritpal Singh operates a BP service station at the corner of North Avenue and Randall Road in St. Charles, Illinois, under a Dealer Lease and Supply Agreement ("the Lease") dated April 8, 2002,  between him and BP. The Lease was scheduled to begin on July 1, 2002 and terminate on June 30, 2005. The Lease and the resulting franchise relationship between Singh and BP are governed by the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.* ("PMPA"). BP owns the real property and equipment at the location, which include a building with a mini-mart and an attached car wash, three pump islands perpendicular to North Avenue, two pump islands parallel to Randall Road, and three underground storage tanks located at the

northwest corner of the MART building ("the Leased Premises"). The station has two full access driveways on North Avenue, measuring 26.5 feet and 38.5 feet in width, and two limited access driveways on Randall Road, measuring 34.5 feet and 27 feet in width.

The Lease sets forth specific criteria for termination of the Lease and the franchise relationship. Specifically, it states that

> Lessor has the right at any time to terminate or nonrenew this Agreement, all associated agreements and any applicable franchise relationship for any reason or ground permitted by the PMPA or other applicable federal, state or local law. Without limited the generality of the foregoing, Lessor has such right of termination or nonrenewal upon the occurrence of any of the following:
> ***
> (l)   Condemnation or other taking, in whole or in part, of the Facility pursuant to the power of eminent domain or a conveyance in lieu thereof.

(Lease, at 10).

At some point before December 30, 2003, the Illinois Department of Transportation ("IDOT") informed BP that as part of a roadway improvement project, it was considering acquiring a portion of the Lease Premises. According to a civil engineering firm hired by BP to analyze the impact of the acquisition, the proposed taking encompassed a 7-foot wide strip of land along North Avenue, starting at the east property line, increasing in width at the northwest corner, and terminating at the west property line along Randall Road. In addition, IDOT indicated its intention to acquire a temporary easement along the Randall Road frontage for construction access, measuring between 5 and 14 feet in width. The roadway improvement project further required the elimination of one full access driveway on North Avenue, one limited access driveway on Randall Road, and the narrowing of the remaining driveway on North Avenue. Finally, the project included the construction of a concrete barrier median on

North Avenue, converting the remaining North Avenue driveway from full access to limited access.

As part of its preparation for the project, IDOT commissioned at least three appraisal reports and two appraisal reviews. In addition, BP retained W-T Engineering, a civil engineering firm, to review the proposed taking and advise BP on how it would affect the circulation path of vehicles and the gasoline delivery tanker truck. W-T Engineering determined that the taking would restrict the gasoline delivery truck's circulation path and require it to travel between the pump islands along Randall Road, which would be impossible if cars were refueling at the pumps. The westernmost underground storage tank's fill pipe would be inaccessible after the taking and the truck would not be able to exit the property. Further, after the taking, there would no longer be sufficient room on the north side of the refueling area for automobiles to circulate, nor could a vehicle make a U-turn on the south side of the islands to exit the property. W-T Engineering therefore advised that the entire premises be razed and rebuilt.

BP and IDOT engaged in discussions regarding IDOT's plans to acquire part of the Leased Premises, including whether IDOT could alter its proposal so that it would impact the Leased Premises less. On December 30, 2003, however, IDOT sent BP a 60 day notice letter of its intent to commence formal eminent domain proceedings. BP sent Singh a letter on January 27, 2004, notifying him that IDOT had instituted eminent domain proceedings. The letter stated that "BP does hereby terminate and nonrenew your Franchise and all related agreements and does hereby terminate and nonrenew any attendant franchise relationship, effective **ten (10) days prior to the date of condemnation or date of sale in lieu of condemnation** ("the Effective Date")." (Compl., Exh. 2).

IDOT filed a Complaint to Condemn in Kane County, Illinois, on April 9, 2005. A "quick take" hearing took place on June 2, 2005, and the Kane County Circuit Court ordered that IDOT would be entitled to take title and possession of the property at issue, including the temporary easement, after deposit of $823,000 preliminary just compensation. On June 3, 2005, BP sent Singh a letter informing him of the result of the quick take hearing and advising him that "the time has come to effectuate the termination and non-renewal noticed on January 27, 2004." The letter stated that "the effective date of termination of the Agreement is **June 17, 2005**." (BP's L.R. 56.1(a)(3) Stmt., Exh. I). Singh filed a motion for preliminary injunction before this Court on June 6, 2005, which motion this Court denied. Pursuant to this Court's April 26, 2004 order, however, the parties could not terminate the franchise agreement until resolution of this matter.

**Singh's Proposed Sale**

In December 2002, Singh informed BP that he had a potential buyer for his assets and gasoline station operation. As required by the Lease, Singh submitted a purchase agreement between him and his potential buyer to BP so that BP could determine whether to exercise its right of first refusal, pursuant to the Lease. BP notified Singh by letter on January 21, 2003, that it would not exercise its right of first refusal. The letter further stated that BP "expressly reserve[d] all other rights" arising under the Lease, applicable law, or other agreements between BP and Singh, for purposes of the proposed transfer to this potential buyer. The candidate never withdrew his purchase offer. BP never granted its consent to the proposed sale.

In March 2004, Singh filed the present action, alleging violations of the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq*., breach of the Lease, and seeking equitable recoupment. The matter comes before this Court on Defendant's Motion for Summary Judgment.

**II.  Standard of Review**

Summary judgment is appropriate "if the pleadings, depositions, and answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 573 (7th Cir. 2003). In deciding a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in her favor. See *Haywood v. Lucent Technologies*, 323 F.3d 524 (7th Cir. 2003). A non-moving party who bears the burden of proof on a specific issue must demonstrate by specific factual allegations that there is a genuine issue of material fact in dispute. *McMillian v. Svetanoff*, 878 F.2d 186, 188 (7th Cir. 1989).

**III.  Analysis**

The Petroleum Marketing Practices Act was enacted to protect service station franchisees from unfair termination and nonrenewal practices by petroleum company franchisors. *Duff v. Marathon Petroleum Co.*, 51 F.3d 741, 743 (7th Cir. 1995). Under the PMPA, the franchisee has "the burden of proving the termination of the franchise," and the franchisor bears the burden of producing evidence to establish that termination or nonrenewal was permitted under Section 2802(b). 15 U.S.C. § 2805(c) (West 1998). The text of the provision on which BP relies in justifying its termination of Singh's franchise states that if the franchisor has given proper notice, "the following are grounds for ... nonrenewal of a franchise relationship:

> (c) The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is

in effect and the franchisor first acquired actual or constructive knowledge of
such occurrence--
> (I) not more than 120 days prior to the date on which notification
> of termination or nonrenewal is given, if notification is given
> pursuant to section 2804(a) of this title; or
> (ii) not more than 60 days prior to the date on which notification of
> termination or nonrenewal is given, if less than 90 days
> notification is given pursuant to section 2804(b)(1) of this title.

15 U.S.C. § 2802(b)(2) (West 1998).

Singh objects to the timing of his notification and to the reasonableness of the purported termination. Congress provided an illustrative list of events which would be reasonable grounds for termination in 15 U.S.C. § 2802(c). The list is non-exclusive, "[h]owever, the enumerated list is intended to provide a measure of Congressional intent with respect to the meaning of this statutory standard.... [E]vents which are not enumerated in subsection (c) must be carefully scrutinized by the courts prior to a determination that the statutory standard set forth in section 102(b)(2)(c) has been satisfied." Senate Report at 37-38, 1978 U.S. Code Cong. & Ad. News at 896. As the Third Circuit stated in a similar case brought under the PMPA, there "is no other statutory basis to apply a reasonableness test." *Lugar v. Texaco, Inc.*, 755 F.2d 53, 58 (3d Cir. 1985). In *Lugar*, the franchisor decided to supply its branded products to service stations through distributors, rather than continue directly supplying its franchisees. To that end, Texaco advised its franchisee, Lugar, that it would not renew the lease and sales agreement between them. The Third Circuit found that Texaco's decision not to renew fit within the language of section 2804(c)(4) of the statute. Thus, it determined that "the court could not evaluate the reasonableness of Texaco's action under 15 U.S.C. § 2802(b)(2)(c)." 755 F.2d at 58.

In the case before this Court, BP seeks to terminate the lease agreement with Singh because the Kane County Circuit Court has ordered condemnation of a portion of the Leased

Premises. One of the 12 enumerated grounds for termination or nonrenewal is "condemnation or other taking, in whole or in part, of the marketing premises pursuant to the power of eminent domain." 15 U.S.C. § 2802(c)(5) (West 1998). Singh asserts that the PMPA is remedial legislation designed to alleviate the "disparity of bargaining power between franchisor and franchisee and the harsh consequences of suddenly termination a business for which the franchisee has worked long and hard to develop goodwill." *Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1220 (7th Cir. 1982). Singh therefore urges this Court to give the PMPA a liberal construction. *See, e.g., United States v. Bacto-Unidisk*, 394 U.S. 784, 798 (1969). Even a liberal interpretation, however, will not read section 2802(c)(5) out of the statute. That section permits termination in the event of "condemnation, in whole or *in part*" of the marketing premises. 15 U.S.C. § 2802(c)(5) (emphasis added).

Singh does not dispute that a portion of the real property has been condemned through eminent domain. Instead, he asserts that the condemnation will not affect the operation of the gas station at that location. In addition, he seeks to read the words "marketing premises" in section 2802(c)(5) narrowly, so as to apply only to the portion of the real property where products are marketed, e.g., the mini-mart, the gas pumps, and the car wash. Such a reading warps the language of the statute beyond reason. Singh's contention ignores the legal description of the leased premises, which was attached to the Lease.[1] Singh further argues that BP has planned to terminate his franchise since 2001 because it intended to shift away from franchises toward

---

[1] Singh contends that the legal description was not attached to the Lease when he signed it. But the copy of the Lease that Singh submitted with his L.R. 56.1 statement included the legal description of the premises. The parties do not dispute that the condemned land falls within the boundaries of the legal description.

company-owned and -operated service stations ("BP Connect"). Instead of providing him with the PMPA-specified compensation, Singh asserts that BP seeks to use the condemnation exception to the PMPA's general prohibition on termination as a pretext for terminating his franchise and denying him compensation. In support of his argument that BP cannot rely on the condemnation exception to terminate his Lease, Singh relies on an unreported case from this District, *Moz, Inc. v. Shell Oil Co.*, No. 85 C 9016, 1986 WL 3613, at *3 (N.D. Ill. Mar. 17, 1986). But in *Moz*, the court noted that "[a]ny condemnation apparently occurred prior to the date" the franchise agreements were executed. *Id.* The *Moz* court further stated that the PMPA does not authorize "a termination based on a condemnation or other taking of property not part of the leased premises." *Id.* In the case before this Court, however, the evidence is clear that the condemnation occurred after Singh and BP entered the Lease. Moreover, it does affect a portion of the property subject to that agreement. Thus, *Moz* is distinguishable and the condemnation falls squarely within the language of the statute. BP's termination is, therefore, reasonable under the PMPA.

This Court next must examine whether BP complied with the notice requirements of the PMPA. Section 2802(b)(2)(c) provides that a permissible ground for termination of a franchise relationship is,

> The occurrence of an event which is relevant to the franchise relationship and as a result of which the termination of the franchise ... is reasonable, if ... the franchisor first acquired actual or constructive knowledge of such occurrence–
> ***
> > (ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given....

15 U.S.C. § 2802(b)(2)(c).

Singh argues that BP knew it wanted to shift from dealer-operated service stations to company-owned and -operated BP Connect stations as early as 2001. Thus, he contends that the January 27, 2004 letter does not constitute a notice of termination under the PMPA, as evidenced by the need to send a follow-up letter on June 3, 2005, which he also denies was a proper notice of termination. In any event, Singh avers that the gas station would remain a going business concern even after the proposed taking. BP responds that its interest in purchasing land across the street from Singh's station to construct a BP Connect station is unrelated to its right to terminate the Lease under the PMPA. Further, it denies that the January 27, 2004 letter was deficient as notice under the Act. Finally, BP contends that Singh's opinion about the continued viability of the property as a gas station is irrelevant to the issues of proper notice and BP's right to terminate the Lease.

The most logical approach is to separate what are distinct issues and address each in turn. First, this Court must determine whether BP provided adequate notice of termination under the PMPA to Singh. Under Section 2804, a franchisor generally must provide 90 days advance notice of termination or nonrenewal to a franchisee. 15 U.S.C. § 2804(a). But "in circumstances in which it would not be reasonable" for the franchisor to furnish notification 90 days prior to the date of termination, the Act directs a franchisor to notify the franchisee on the earliest date that is "reasonably practicable." 15 U.S.C. § 2804(b)(1). On December 30, 2003, IDOT sent BP a 60 day notice of its intent to institute formal eminent domain proceedings against a portion of the Leased Premises. BP then sent Singh a letter on January 27, 2004, in which BP advised Singh that it thereby terminated and nonrenewed his Franchise and all related agreements, effective 10 days prior to the date of condemnation or date of sale in lieu of condemnation. IDOT's

December 30 letter indicated that it would not institute a formal eminent domain proceedings any sooner than the end of February 2004–60 days after the date of the letter–but did not specify whether it might delay beyond that time. Further, neither IDOT nor BP could predict when a court might decide any eminent domain petition. In response to that uncertainty, BP informed Singh that the date of termination would be 10 days prior to the date of condemnation, which process IDOT had commenced. On June 2, 2005, the Kane County Circuit Court issued an order granting IDOT's eminent domain petition. BP accordingly notified Singh that the date of termination was set for June 17, 2005.

Singh argues that BP's notice is defective because the June 3, 2005 letter provides only 14 days notice of termination, instead of the 90 days required by Section 2802(b)(2)(c). But Singh is relying on Section 2802(b)(2)(C)(i), which deals with general notification requirements under section 2804(a). BP, however, contends that the relevant provision governing notice is section 2804(b)(1), because it was not reasonable for BP to give 90 days notice of termination to Singh; BP did not know when IDOT would take the land in question. Thus, BP gave notice at the earliest date practicable. BP acquired actual knowledge of IDOT's intent to take a portion of the Leased Premises on December 30, 2005, when IDOT sent its formal 60 day notice. BP notified Singh of the termination less than 30 days later. At that point, it was possible that IDOT's eminent domain petition would be granted within 90 days; thus, section 2804(b)(1) applies and BP's notice complied with the statute. Contrary to Singh's assertions, BP's June 3, 2005 letter was not an "acknowledgment" of defect in its prior notification, but rather a confirmation letter, fixing the effective date of termination according to the notification previously given. *Romero Rodriguez v. Esso Standard Oil Co.*, 636 F. Supp. 615, 617-18 (D.P.R. 1986).

In Count III of his complaint, Singh alleges that BP breached the Lease when it refused to provide its consent to the sale of Singh's business. Specifically, Singh argues that BP breached Paragraph 30 of the Lease, which required BP to either exercise its right of first refusal or provide its written consent to any proposed sale. The Lease also stated that BP could not unreasonably withhold its consent. The parties dispute the factual circumstances of the proposed sale and whether Singh and his proposed buyer did or did not request additional time to consider the deal. It is undisputed, however, that Singh provided the required information about the proposed sale to BP for its right of first refusal decision, that BP declined to exercise its right of first refusal, and that BP expressly reserved all other rights under the Lease and did not provide written consent to the sale. As a result, Singh contends BP breached the Lease and that he accordingly lost the $320,000 purchase price for his business.

The evidence submitted shows that the proposed IDOT taking, about which BP, Singh, and the proposed buyer were all informed, would require a significant physical reconfiguration of the Leased Premises. Two of the four driveways will be eliminated, and both of the remaining driveways will be narrower, limited-access driveways. The civil engineering assessment BP requested from an outside firm reported that there would no longer be sufficient room on the north side of the refueling area for automobiles to circulate. In addition, the engineers determined that the gasoline delivery truck would be unable to access the underground storage tanks if cars were refueling at the station and, in any event, would be unable to exit the property. Based on this assessment, BP contends that it believed the taking would render the gas station unsafe for consumers and that it was therefore reasonable to withhold its consent to the proposed sale.

Singh asserts that the specialty report that IDOT solicited from an outside engineering firm found that the gasoline tanker truck would be able to exit the property, if the remaining driveway on Main Street was relocated 9 feet to the east. But the assessment also determined that the three gas pump islands along Main Street would have to be realigned from a north-south direction to an east-west orientation in order for vehicles to have full access. Another of IDOT's outside appraisers found that site failed to conform to current zoning requirements in several respects. In addition, IDOT's appraisers reported that the car wash on the site required a special use permit from the city. Changes to the site–such as gas pump realignment–could trigger loss of the special use permit for the car wash and necessitate additional reconfiguration to comply with zoning requirements. Singh notes that IDOT's reviewing appraiser (an IDOT employee) disagreed with the reports submitted by IDOT's outside appraisers. A closer review of the IDOT appraisal review packet reveals that IDOT's reviewing appraiser, Fred Tadrowski, disagreed with the "total consideration ... in the subject property," or the value assigned to the property. There is no indication that IDOT disagreed with the appraisers' findings that the taking would negatively impact vehicle circulation, including gasoline tanker truck egress, require site reconfiguration, and potentially expose the site to additional zoning restrictions. Given the impact of such changes, this Court finds that BP had legitimate business concerns about the impact of condemnation and necessary reconfiguration of the station, and therefore did not act in an unreasonable manner in withholding its consent to the proposed sale of Singh's business. Thus, this Court finds that BP did not breach paragraph 30 of the Lease.

Finally, Singh seeks equitable recoupment under Illinois law to recover the substantial investment he made in the business and the site. BP argues that summary judgment should be

granted because equitable recoupment may only be raised as a counterclaim. This Court agrees. In Illinois, equitable recoupment is a counterclaim brought to diminish or defeat a party's (generally, plaintiff's) recovery. *Sikora v. AFD Indus., Inc.*, 18 F. Supp. 2d 841, 847 (N.D. Ill. 1998); *Cox v. Doctor's Assocs., Inc.*, 613 N.E.2d 1306, 1316 (Ill. Ct. App. 1993). But a party claiming equitable recoupment must show that there was no just cause for the breach of contract. *See Cox*, 613 N.E.2d at 1316; *see also Tibor Mach Prods., Inc. v. Freudenberg-Nok Gen'l P'ship*, 967 F. Supp. 1006, 1019-20 (N.D. Ill. 1997). Here, however, BP did not breach the contract. An equitable recoupment claim will not lie.

## Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED. This case is terminated.

Enter:

/s/ David H. Coar
_____
David H. Coar
United States District Judge

Dated: **January 31, 2006**